# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 2, 2023

Lyle W. Cayce
Clerk

No. 21-11180

---

Allyson Raskin, *on behalf of her minor children* JD1 and JD2,

*Plaintiff—Appellant,*

*versus*

Dallas Independent School District; Dallas Independent School District Board of Trustees; Michael Hinojosa, *Superintendent of the Dallas Independent School District in his individual capacity and in his official capacity as Superintendent of the Dallas Independent School District*; Ben Mackey, *President*; Edwin Flores, *1st Vice President*; Maxie Johnson, *2nd Vice President*; Joe Carreon, *Board Secretary*; Dustin Marshall; Dan Micciche; Karla Garcia; Joyce Foreman; Justin Henry, *all in their Individual Capacities and in their Capacities as Members of the Dallas Indpendent School District Board of Trustees*,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:21-CV-2429

---

Before Higginbotham, Higginson, and Oldham, *Circuit Judges.*

Stephen A. Higginson, *Circuit Judge*:

Allyson Raskin filed this *pro se* action in federal district court alleging, as relevant here, that the Dallas Independent School District (DISD) violated

No. 21-11180

her children's rights under the Genetic Information Nondiscrimination Act (GINA), 42 U.S.C. § 2000ff, *et seq.* The district court dismissed the GINA claims because Raskin lacked Article III standing to bring those claims on her own behalf and because Raskin—who is not a licensed attorney—could not proceed *pro se* on behalf of her children. In reaching the latter conclusion, the district court relied on our unpublished authority that 28 U.S.C. § 1654, which guarantees parties the right to proceed *pro se* in federal court, does not authorize *pro se* parents to litigate their children's claims. *See, e.g.*, *Sprague v. Dep't of Fam. & Protective Servs.*, 547 F. App'x 507, 508 (5th Cir. 2013) (per curiam). Having dismissed the only federal claims alleged in the operative complaint, the district court then declined to exercise supplemental jurisdiction over the state-law claims.[1]

　　On appeal, Raskin contends that the district court erred in holding that she cannot represent her children in federal court.[2] To support Raskin's position, we appointed an amicus, who argues that we should adopt a

---

[1] The original complaint asserted claims under 42 U.S.C. § 1983 alleging that DISD deprived Raskin's children of their constitutional rights. The amended complaint, which does not raise any § 1983 claims, was filed while DISD's motion to dismiss the original complaint was still pending. "An amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (citation omitted). Although we construe Raskin's *pro se* pleadings liberally, *see SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 75 (5th Cir. 1993), we cannot say that her amended complaint "specifically refers to and adopts or incorporates by reference" the original complaint, *King*, 31 F.3d at 346. Accordingly, the amended complaint rendered the original complaint of no effect, and "the district court [had] the option of either denying the pending motion as moot or evaluating the motion in light of the facts alleged in the amended complaint." *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 304 (2d Cir. 2020). Here, the district court acted within its discretion by ruling on the pending motion.

[2] Raskin does not challenge the district court's conclusion that she lacks Article III standing to bring the GINA claims on her own behalf, and so any argument that the district court erred in this regard is waived. *See Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993).

No. 21-11180

multifactor test to determine when a parent can proceed *pro se*. DISD counters that we should adhere to our unpublished caselaw and points to decisions from ten other circuits applying a per se rule against *pro se* parent representation.

Today, we hold that an absolute bar on *pro se* parent representation is inconsistent with § 1654, which allows a *pro se* parent to proceed on behalf of her child in federal court when the child's case is the parent's "own." 28 U.S.C. § 1654. As we explain, this condition would be met if federal or state law designated Raskin's children's cases as belonging to her. Because the district court did not have the opportunity to consider whether Raskin's children's claims under the GINA belong to Raskin within the meaning of § 1654, we VACATE the district court's dismissal of the GINA claims and REMAND for further proceedings rather than take up this inquiry in the first instance.

I.

This case starts and ends with the text of 28 U.S.C. § 1654. In relevant part, § 1654 says that "[i]n all courts of the United States the parties may plead and conduct their own cases personally or by counsel." 28 U.S.C. § 1654. We have understood this provision to comprehensively list all the ways that a party may appear in federal court. *See Gonzales v. Wyatt*, 157 F.3d 1016, 1021 (5th Cir. 1998). So, "a party can represent himself or be represented by an attorney," *id.*, because § 1654 says he can. On the other hand, he "cannot be represented by a nonlawyer," *id.*, because the statute does not include the phrase, "or by a nonlawyer."

But the right to proceed *pro se* under § 1654 is not limited to cases where the *pro se* party is a named plaintiff. The statute provides for *pro se* representation in any case that is a party's "own." 28 U.S.C. § 1654. This language is rooted in the Judiciary Act of 1789, which said that "parties may

No. 21-11180

plead and manage their *own* causes personally or by the assistance of . . . counsel[.]" Judiciary Act of 1789, 1 Stat. 73, 92 (emphasis added). At the Founding, "own" meant "belonging to" oneself, Samuel Johnson, A Dictionary of the English Language (1755) (Beth Rapp Young et al. eds., 2021); *see, e.g.*, U.S. Const., art. I § 5 ("Each House shall be the Judge of the Elections, Returns and Qualifications of its *own* Members[.]" (emphasis added)), and it means the same thing today, *Own*, Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/own (last visited Feb. 6, 2023) (same). Accordingly, for a person to invoke § 1654, the only requirement is that the case he seeks to prosecute must belong to him.[3]

Taken by itself, § 1654 does not say when a child's case belongs to the parent. However, as our court has recognized, at common law, non-attorneys could not litigate the interests of others. *See Guajardo v. Luna*, 432 F.2d 1324, 1324 (1970) (per curiam); *see, e.g.*, *Collinsgru v. Palmyra Bd. of Educ.*, 161 F.3d 225, 232 (3d Cir. 1998), *abrogated on other grounds by Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007); *Russell v. United States*, 308 F.2d 78, 79 (9th Cir. 1962) (per curiam); *Collins v. O'Brien*, 208 F.2d 44, 45 (D.C. Cir. 1953) (per curiam), *cert. denied*, 347 U.S. 944 (1954); *Acme Poultry Corp. v. United States*, 146 F.2d 738, 740 (4th Cir. 1944) (rule for corporations); *Schifrin v. Chenille Mfg. Co.*, 117 F.2d 92, 94 (2d Cir. 1941) (describing whether and what kind of remedies are appropriate for violation of this rule, and collecting cases); *Heiskell v. Mozie*, 82 F.2d 861, 863 (D.C. Cir. 1936); *Turner v. Am. Bar Ass'n*, 407 F. Supp. 451, 477 (S.D. Tex. 1975);

---

[3] This interpretation is consistent with the general rule that corporations cannot appear *pro se* under § 1654. § 1654 gives a party the right to plead and conduct a case "personally." 28 U.S.C. § 1654. A corporation, which is a "fictional legal person, obviously cannot appear for [itself] personally." *Sw. Express Co. v. Interstate Com. Comm'n*, 670 F.2d 53, 55 (5th Cir. 1982) (citation omitted).

No. 21-11180

*In re Looney*, 262 F.209, 212 (W.D. Tex. 1920); *Weir v. Slocum*, 3 How. Pr. 397, 398 (N.Y. Sup. Ct. 1849); *see also Faretta v. California*, 422 U.S. 806, 828 (1975) ("The right of *self*-representation was guaranteed in many colonial charters and declarations of rights," and those documents gave "the colonists a right to choose between pleading through a lawyer and representing *oneself*." (emphases added)); *Ex parte Secombe*, 60 U.S. 9, 13 (1856) ("[I]t has been well settled, by the rules and practice of common-law courts, that it rests exclusively with the court to determine who is qualified to become one of its officers, as an attorney and counsellor, and for what cause he ought to be removed.").[4] Nothing in § 1654 abrogates this common-law rule or its corollary that non-attorney parents cannot act as attorneys for their children, *see Winkelman*, 550 U.S. at 536 n.1 (Scalia, J., concurring in the judgment in part and dissenting in part). Thus, a child's case only belongs to the parent under § 1654 if some other source of law alters the common-law backdrop.

---

[4] Although the Supreme Court has long recognized that the "office" of an attorney "confers upon him [a right] to appear for suitors, and to argue cases," *Ex parte Garland*, 71 U.S. 333, 379 (1866), lay practitioners who were not admitted to the bar represented others in court at various points before and after the Revolution. *See* Barlow F. Christensen, *The Unauthorized Practice of Law: Do Good Fences Really Make Good Neighbors—or Even Good Sense?*, 1980 Am. Bar. Found. Rsch. J. 159, 161-75. For example, John Adams complained that he "found the practice of law grasped into the hands of deputy sheriffs, pettifoggers and even constables who filled all the writs upon bonds, promissory notes, and accounts, received the fees established for lawyers, and stirred up many unnecessary suits." *Id.* at 167 (citation omitted). The rights of these non-attorneys "to appear as the attorney of another," having "produc[ed] a warrant of attorney" from the client authorizing the representation, *Osborn v. Bank of U.S.*, 22 U.S. 738, 829 (1824), have always been limited by the provision now codified at § 1654, which empowers federal courts to set rules for the appearance of counsel, *see Garland*, 71 U.S. at 362. There is no reason to think that these non-attorney counsel were acting as the "next friend" of a party without capacity to sue or to authorize the non-attorney to act as his representative.

No. 21-11180

Other federal statutes can overwrite the general rule against *pro se* parent representation. We have previously decided that a child's appeal from certain administrative decisions under the Social Security Act, 42 U.S.C. § 405(g), belongs to the parent such that the parent can proceed *pro se* on the child's behalf in federal court. *See Harris v. Apfel*, 209 F.3d 413, 416-17 (5th Cir. 2000); *Machadio v. Apfel*, 276 F.3d 103, 107 (2d Cir. 2002) (similar). And the Supreme Court has left open the question of whether the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, similarly "entitles parents to litigate their child's claims *pro se*." *Winkelman*, 550 U.S. at 535.

We also look to state law in determining whether one person's case belongs to another under § 1654. *See Rodgers v. Lancaster Police & Fire Dep't*, 819 F.3d 205, 211-12 (5th Cir. 2016). For example, if state law affords a parent the right to proceed *pro se* on behalf of her child, the child's case is the parent's "own" within the meaning of § 1654. This is because the state, in giving a parent this right, assigns to the parent the child's "individual choice to proceed *pro se*," *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990), signals that "the minor's interests would be furthered by [the parent's] representation," *id.*, permits the parent to waive the child's right to counsel, *see Osei-Afriyie ex rel. Osei-Afriyie v. Med. Coll. of Pa.*, 937 F.2d 876, 883 (3d Cir. 1991), and trusts the parent to represent the child. Where state law has this effect, the parent acts within the parent-child relationship—"a traditional area of state concern," *Moore v. Sims*, 442 U.S. 415, 435 (1979)—as the child's *pro se* alter ego. § 1654 does not disturb these state law determinations about the substance of the parent-child relationship. *See Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581 (1979) ("State family and family-property law must do major damage to clear and substantial federal interests before the Supremacy Clause will demand that state law be overridden," and then Congress must have "positively required by direct enactment that state law be pre-empted." (cleaned up)); *Hillman v. Maretta*,

No. 21-11180

569 U.S. 483, 490-91 (2013) (same).  To the contrary, Congress left open to states the choice to authorize non-attorney parents to represent their children.[5]

Our unpublished cases[6] and authority from other circuits[7] have adopted an absolute bar against *pro se* parent representation without fully

---

[5] It is important not to confuse capacity to sue under Federal Rule of Civil Procedure 17 and the right to proceed *pro se* under § 1654.  While minors do have a right to proceed *pro se* under § 1654, under Texas law and Rule 17(b), minors cannot exercise that right because they lack capacity to sue.  Under Rule 17(c)(1), a minor's guardian can sue "on behalf" of the minor in federal court.  As we explained, this does not answer the question of whether the minor's case is the guardian's "own" such that the guardian can proceed *pro se* under § 1654.  Stated otherwise, we must not conflate capacity, which concerns "a party's personal right to come into court," WRIGHT & MILLER, 6A FED. PRAC. & PROC. § 1559 (3d ed. 2022), and representation, which asks who gets to act as the legal representative of the party in court proceedings.  It is true that under Texas law, minors can sue through a legal guardian.  Just because a *represented* guardian can sue on behalf of a child in Texas state court does not mean that the guardian can proceed *pro se* on behalf of the child.  Judge Oldham argues that because, under Texas law, a parent has the "right to represent the child in legal action and to make other decisions of substantial legal significance concerning the child," TEX. FAM. CODE § 151.001(a)(7), a parent can proceed *pro se* on the child's behalf. Yet Texas law does not expressly state that a parent can proceed *pro se*.  On remand, the district court is free to address this issue of Texas law in the first instance and with ample opportunity for adversary briefing on the meaning of § 151.001(a)(7), not done before us, a court of review.

[6] *See, e.g.*, *Dobbs v. Warden*, 2022 WL 4244283, at *3 (5th Cir. Sept. 15, 2022) (per curiam) (unpublished); *Fountain v. Thaler*, 629 F. App'x 592, 595 (5th Cir. 2015) (per curiam) (unpublished); *Sprague*, 547 F. App'x at 507-08 (per curiam) (unpublished); *Johnson v. Lufkin Daily News*, 48 F. App'x 917, 917 (5th Cir. 2002) (per curiam) (unpublished).

[7] *See Crozier ex rel. A.C. v. Westside Cmty. Sch. Dist.*, 973 F.3d 882, 887 (8th Cir. 2020); *Myers v. Loudoun Cnty. Pub. Schs.*, 418 F.3d 395, 399-401 (4th Cir. 2005); *Shepherd v. Wellman*, 313 F.3d 963, 970 (6th Cir. 2002); *Navin v. Park Ridge Sch. Dist. 64*, 270 F.3d 1147, 1149 (7th Cir. 2001); *Devine v. Indian River Cnty. Sch. Bd.*, 121 F.3d 576, 581 (11th Cir. 1997), *overruled in part on other grounds*, *Winkelman*, 550 U.S. at 535; *Johns v. Cnty. of San Diego*, 114 F.3d 874, 876-77 (9th Cir. 1997); *Ethan H. v. New Hampshire*, 968 F.2d 1210, 1992 WL 167299, at *1 (1st Cir. July 21, 1992) (per curiam) (unpublished); *Osei-Afriyie*, 937

No. 21-11180

accounting for the text of § 1654.  At best, those cases assert that § 1654 "does not speak to the issue" of "whether [the parent] may plead or conduct his [child's] case," *Devine*, 121 F.3d at 581, rest on the premise that "[t]he right to litigate for *oneself* . . . does not create a coordinate right to litigate for *others*," *Myers*, 418 F.3d at 400, or conclude that "because a minor's personal cause of action is her own," it "does not belong to her parent," *Shepherd*, 313 F.3d at 970.  At worst, they assume, without considering state law, that "[t]here is nothing in the guardian-minor relationship that suggests that the minor's interests would be furthered by representation by the non-attorney guardian," *Cheung*, 906 F.2d at 61, or apply an absolute bar without giving any reason, *see Meeker*, 782 F.2d at 154.  By recognizing that the meaning of "their own cases" in § 1654 sometimes depends on other federal and state law, we make a minor course correction in our circuit.

The absolute bar in our fellow circuits is designed to ensure that when children "have claims that require adjudication," they receive "trained legal assistance so their rights may be fully protected."  *Cheung*, 906 F.2d at 61. This policy concern is reflected in the common law and prevails absent federal or state law to the contrary.  But where a state has decided that *pro se* parental representation *does* adequately protect children's rights, the text of § 1654 does not allow us to interfere absent extenuating circumstances.[8]  *See, e.g.*, *Hoffert v. Gen. Motors Corp.*, 656 F.2d 161, 164 (5th Cir. Unit A Sept. 1981) (holding that courts "have inherent power to appoint a guardian ad

---

F.2d at 882-83; *Cheung*, 906 F.2d at 61; *Meeker v. Kercher*, 782 F.2d 153, 154 (10th Cir. 1986) (per curiam).

[8] In addition to the usual factors district courts consider in deciding whether appointment of counsel is warranted, *see Ulmer v. Chancellor*, 691 F.2d 209, 213 (5th Cir. 1982), district courts may also account for whether denying counsel to a minor litigant would force the minor out of court and prejudice the minor's claim.

No. 21-11180

litem when it appears that the minor's general representative has interests which may conflict with those of the person he is supposed to represent").

Moreover, in some circumstances, the absolute bar may not protect children's rights at all. When counsel is unavailable, the absolute bar "undermine[s] a child's interest in having claims pursued for him or her," and "may force minors out of court altogether." *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 286 (2d Cir. 2005). "Children represent a disproportionate number of those living in poverty in the United States," and "[t]here is a dearth of legal services available" in this country "to meet the legal needs of those who cannot afford to pay." Lisa V. Martin, *No Right to Counsel, No Access Without: The Poor Child's Unconstitutional Catch-22*, 71 Fla. L. Rev. 831, 856 (2019). As a result, "the mandate that parents retain counsel to advance their children's claims cannot be met by a substantial portion of families." *Id.* at 858.

At least in part, the absolute bar expresses our need to "jealously guard[] [our] authority to govern those who practice in [our] courtrooms." *Myers*, 418 F.3d at 400. From this perspective, "[r]equiring a minimum level of competence protects not only the [client] but also his or her adversaries and the court from poorly drafted, inarticulate, or vexatious claims," *Collinsgru*, 161 F.3d at 231. But Congress did not write an absolute bar into § 1654. And we already live on a *pro se* planet. Between 2000 and 2019, twenty-seven percent of all civil cases had at least one *pro se* plaintiff or defendant. U.S. Cts., Just the Facts: Trends in Pro Se Civil Litigation from 2000 to 2019 (Feb. 11, 2021). Last year, forty-six percent of filings in federal courts of appeals were *pro se*. Chief Justice John G. Roberts, Jr., U.S. Sup. Ct., 2022 Year-End Report on the Federal Judiciary 6 (2022). *Pro se* litigants routinely practice in our courtrooms, as § 1654 permits.

No. 21-11180

## II.

In this case, the district court faithfully followed our unpublished authority that *pro se* parents cannot represent their children except in Social Security appeals. However, as we now clarify, because § 1654 does not absolutely bar parents from proceeding *pro se* on behalf of their children, we must conclude the district court erred in failing to consider whether federal or state law designates Raskin's children's claims as her "own" such that she can represent them. Accordingly, the district court's dismissal of the GINA claims is vacated. On remand, it will be Raskin's burden to establish that under § 1654, federal or state law authorizes her to proceed *pro se* on behalf of her children.

Still, on remand, the district court remains free to "note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair to the parties," *Century Sur. Co. v. Blevins*, 799 F.3d 366, 372 (5th Cir. 2015) (citation omitted). In this circuit, "fairness requires that a litigant have the opportunity to be heard before a claim is dismissed, except where the claim is patently frivolous." *Id.* A claim is frivolous when it is "so lacking in merit that it [is] groundless."[9] *United States v. Mississippi*, 921 F.2d 604, 609 (5th Cir. 1991). Since dismissal of a patently frivolous claim does not require a response from a *pro se* parent, a district court can dismiss a claim alleged by such a parent without considering

---

[9] Here, Raskin brings claims on her children's behalf under the GINA. But that statute "prohibits an employer from discriminating or taking adverse actions against an employee because of genetic information with respect to the employee" or "request[ing], requir[ing], or purchas[ing] genetic information with respect to an employee or a family member of the employee." *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 826 (5th Cir. 2015) (cleaned up). It is not apparent from the face of the operative complaint how this statute has any relevance to DISD's alleged conduct or Raskin's children.

No. 21-11180

whether the parent is qualified to bring the suit in the first place. Under those circumstances, dismissal of the claim should ordinarily be without prejudice.

In any event, we leave it up to the district court to decide whether this case is best resolved by considering the implications of federal or state law vis-à-vis § 1654 or through an alternative procedural mechanism like *sua sponte* dismissal.

The district court's dismissal of the GINA claims is VACATED and the case is REMANDED for further proceedings consistent with this order.

No. 21-11180

Andrew S. Oldham, *Circuit Judge*, dissenting in part and concurring in the judgment:

Since the First Judiciary Act in 1789, every person—including a minor—has enjoyed a right to litigate *pro se* in federal court. The question presented is whether a parent can vindicate that right for her children, just as she can vindicate her children's other rights. The district court said no. The majority says maybe. I would say absolutely.

## I.

Allyson Raskin is not an attorney. On October 4, 2021, however, she filed a *pro se* complaint on behalf of herself and her minor children against the Dallas Independent School District and the District's Superintendent, the Board of Trustees, and various Board members (collectively "Dallas ISD"). The complaint listed both minor children ("JD1" and "JD2"), as well as Ms. Raskin, as plaintiffs. On October 26, 2021, Dallas ISD filed a motion to dismiss the complaint, arguing in relevant part that Ms. Raskin lacks standing to proceed *pro se* on her children's behalf. Ms. Raskin responded by filing a "Response to Motion to Dismiss," an "Amendment to Complaint," and an "Emergency Motion for a Preliminary Injunction"—all on November 16, 2021. All of her district court pleadings were cogent, persuasive, and included citations to relevant legal authorities.

In a puzzling opinion, the district court dismissed the complaint for lack of subject matter jurisdiction. "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019). It's both undisputed and indisputable that two of the plaintiffs—minors JD1 and JD2—have standing to sue, and hence the district court had jurisdiction over the case. But the district court somehow overlooked the minors' standing, and "*sua sponte* dismisse[d] without prejudice for lack of Article III standing the federal

No. 21-11180

claims in Plaintiffs' Amended Complaint" based on Ms. Raskin's purported incapacity to sue on the children's behalf.

Ms. Raskin timely appealed. She filed two excellent briefs in our court. She timely and properly filed the Record Excerpts required by our rules. And on November 9, 2022, Ms. Raskin presented oral argument in front of our panel. Ms. Raskin was a passionate and effective advocate.

II.

"Jurisdiction is always first." *Arulnanthy v. Garland*, 17 F.4th 586, 592 (5th Cir. 2021) (quotation omitted). The district court *sua sponte* held that it somehow lacked subject matter jurisdiction over this case. That was wrong for at least three reasons.

First, as noted above, it takes just one plaintiff with standing to create a justiciable case or controversy. *Dep't of Commerce*, 139 S. Ct. at 2565. The two minor children, JD1 and JD2, unquestionably satisfy this requirement. They have concrete and particularized injuries, traceable to the defendants' conduct, and redressable by a favorable judicial decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The complaint contains well-pleaded facts, for example, that JD1 has suffered anxiety, depression, and social ostracism on account of Dallas ISD's policies. JD2 likewise suffered anxiety, but it was so severe that JD2 was forced out of Dallas ISD and into a small private school. That is far more than our cases require to establish JD1's and JD2's standing.

Second, the district court seemed troubled by Ms. Raskin's invocation of her children's injuries in addition to her own. But *jus tertii* standing is well established in the law. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 193 (1976). In fact, the Supreme "Court almost routinely . . . permit[s] assertions of third-party standing upon finding (i) some sort of 'relationship' between the litigants seeking third-party standing and those whose rights they want to

No. 21-11180

assert and (ii) some sort of impediment to third parties' effective assertion of their own rights through litigation." Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer, & David L. Shapiro, Hart & Wechsler's The Federal Courts and the Federal System 165 (7th ed. 2015). And these rules appear easily satisfied here. Like the near-beer vendor in *Craig*, Ms. Raskin has her own independent injuries—Ms. Raskin, for example, has been forced to spend $10,000 a year in JD2's tuition on account of Dallas ISD's policies. And that allows her to complain not only of her own injuries but also of her children's. The "special relationship" between a mother and her children makes the beer vendor-vendee relationship in *Craig* pale in comparison. And there's an obvious obstacle to JD1 and JD2's effective assertion of their own rights—Dallas ISD's extraordinary efforts to prevent this case from being heard, and its intrepid lawyers' at-all-costs litigation strategy proves it.

Third, even if all of that's wrong, it doesn't defeat Article III jurisdiction. As the Supreme Court has said, "limitations on a litigant's assertion of *jus tertii* are not constitutionally mandated, but rather stem from a salutary 'rule of self-restraint' designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative." *Craig*, 429 U.S. at 193. And more generally, as the Supreme Court recently reminded us earlier this Term:

> Jurisdiction, this Court has observed, is a word of many, too many, meanings. In particular, this Court has emphasized the distinction between limits on the classes of cases a court may entertain (subject-matter jurisdiction) and nonjurisdictional claim-processing rules, which seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times . . . .

No. 21-11180

To police this jurisdictional line, this Court will treat a procedural requirement as jurisdictional only if Congress 'clearly states' that it is. This principle of construction is not a burden courts impose on Congress. To the contrary, this principle seeks to avoid judicial interpretations that undermine Congress' judgment. Loosely treating procedural requirements as jurisdictional risks undermining the very reason Congress enacted them.

Procedural rules often seek to promote the orderly progress of litigation within our adversarial system. Limits on subject-matter jurisdiction, in contrast, have a unique potential to disrupt the orderly course of litigation. Branding a rule as going to a court's subject-matter jurisdiction alters the normal operation of our adversarial system. For purposes of efficiency and fairness, our legal system is replete with rules like forfeiture, which require parties to raise arguments themselves and to do so at certain times. Jurisdictional bars, however, may be raised at any time and courts have a duty to consider them sua sponte. When such eleventh-hour jurisdictional objections prevail post-trial or on appeal, many months of work on the part of the attorneys and the court may be wasted. Similarly, doctrines like waiver and estoppel ensure efficiency and fairness by precluding parties from raising arguments they had previously disavowed. Because these doctrines do not apply to jurisdictional objections, parties can disclaim such an objection, only to resurrect it when things go poorly for them on the merits.

Given this risk of disruption and waste that accompanies the jurisdictional label, courts will not lightly apply it to procedures Congress enacted to keep things running smoothly and efficiently. Courts will also not assume that in creating a mundane claims-processing rule, Congress made it unique in our adversarial system by allowing parties to raise it at any time and requiring courts to consider it *sua sponte*.

No. 21-11180

*Wilkins v. United States*, 143 S. Ct. 870, 875–76 (2023) (quotation omitted). I am aware of no rule—and neither the district court nor Dallas ISD cited any—that suggests failure to hire an attorney is a jurisdictional defect. Thus, the federal courts have subject matter jurisdiction over this dispute.

The majority opinion says otherwise only by ignoring Ms. Raskin's original complaint, the numerous factual allegations in it, and the four legal claims it pleaded. The majority opinion justifies this result by holding that Ms. Raskin's "Amendment to Complaint" operated to delete and then supersede her original complaint. *See ante*, at 2 n.1. I dissent from that determination.

An amendment supplements—rather than supersedes—the original complaint if the amendment "refers to and adopts or incorporates by reference the earlier pleading." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam). And as we recently explained, such "incorporation by reference" need only have the "degree of specificity and clarity which would enable the responding party to easily determine the nature and extent of the incorporation." *New Orleans Ass'n of Cemetery Tour Guides v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1033 (5th Cir. 2023) (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1176 (5th Cir. 2006)).

Every reasonable defendant would understand that Ms. Raskin amended her complaint rather than superseded it. In her amendment, Ms. Raskin explained that after filing the original complaint, she discovered "[n]ew information not available at the time of the original filing" that further "substantiates Plaintiff's case." Accordingly, she added five new counts on top of her original four. And she numbered the additional claims in the Amendment as Counts V through IX—obviously supplementing (rather than deleting and superseding Counts I through IV in the original complaint). She also omitted *all* the prefatory content that she included in the original

No. 21-11180

complaint, including a list of the parties, the basis for jurisdiction and venue, and a statement of the facts (altogether, roughly 20 pages of material)—obviously relying on that material to survive the Amendment. And lest there be any residual doubt, Ms. Raskin titled her filing as an "*Amendment* to Complaint," not, for example, an "*Amended* Complaint." This was more than enough to "enable the responding party to easily determine the nature and extent of the incorporation." *Ass'n of Cemetery Tour Guides*, 56 F.4th at 1033 (quotation omitted). In fact, I cannot imagine how any reasonable defendant could receive Ms. Raskin's "Amendment" and understand it to do anything other than what it says—that is, it made an "Amendment" to the original complaint by adding five new claims without deleting the first four (and the accompanying allegations).[1]

### III.

Turning to the merits, I first (A) explain that federal and state law allow Raskin to represent her minor children without hiring an attorney. Then I (B) analyze and reject Dallas ISD's counterarguments.

### A.

The merits of this dispute turn on 28 U.S.C. § 1654, which provides: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel." This language has remained unchanged since 1948. *See* Act of January 6, 1948, Pub. L. No. 80-646, 62 Stat. 964, 944. But the right of self-representation has a far deeper basis in Anglo-American

---

[1] That's doubly true here because "[t]he filings of a *pro se* litigant are to be liberally construed." *Coleman v. United States*, 912 F.3d 824, 828 (5th Cir. 2019). To expect more of any litigant—much less a *pro se* one—undercuts a primary goal of the Federal Rules of Civil Procedure: "to encourage pleadings that are short, concise, and free of unwarranted repetition as well as to promote convenience in pleading." 5A Charles Alan Wright et al., Federal Practice and Procedure § 1326 (4th ed., April 2023 update).

No. 21-11180

law. Some trace it to the Magna Carta. *See* Nina Ingwer VanWormer, *Help at Your Fingertips: A Twenty-First Century Response to the Pro Se Phenomenon*, 60 Vand. L. Rev. 983, 987 (2007) (citing Magna Carta art. XL, which provides: "To no one will we sell, to no one will we refuse or delay, right or justice."). Others claim the right began "as a bulwark against the abuses of the English Star Chamber, in which individuals were forced to be represented by state counsel in politically motivated trials." Lisa V. Martin, *No Right to Counsel, No Access Without: The Poor Child's Unconstitutional Catch-22*, 71 Fla. L. Rev. 831, 846 (2019) [hereinafter *No Right, No Access*]; *see also Faretta v. California*, 422 U.S. 806, 821–22 (1975) (discussing the practices of, and reactions against, the English Star Chamber).

Regardless of when exactly the self-representation right emerged, it has deep roots in the American Founding. *See Faretta*, 422 U.S. at 826 ("In the American Colonies the insistence upon a right of self-representation was, if anything, more fervent than in England."). The Founding generation maintained an abiding "appreciation of the virtues of self-reliance." *Ibid.* Informed by "the 'natural law' thinking that characterized the Revolution's spokesmen," the "Founders believed that self-representation was a basic right of a free people." *Id.* at 830 n.39. That's primarily because the Founders understood "the freedom to state one's own case" as "a defense against government oppression" and "a guarantee of individual dignity and autonomy." *No Right, No Access*, *supra*, at 846. Thomas Paine, for example, argued in support of the 1776 Pennsylvania Declaration of Rights by explaining that people had "a natural right to plead [their] own case." *Faretta*, 422 U.S. at 830 n.39 (quoting *Thomas Paine on a Bill of Rights, 1777*, *reprinted in* 1 Bernard Schwartz, The Bill of Rights: A Documentary History 314, 316 (1971)).

Equally strong as the Founding generation's belief in the "virtues of self-reliance" was its "distrust of lawyers." *Id.* at 826. The colonists' anti-

No. 21-11180

lawyer sentiment stemmed from their experiences with the Justices of the King's Court as well as the Crown's Attorneys- and Solicitors-General—whom many colonists believed "twist[ed] the law to secure convictions" of "those who opposed the King's prerogatives." *Ibid.* (quoting CHARLES WARREN, A HISTORY OF THE AMERICAN BAR 7 (1911)); *see also id.* at 827 ("[D]istrust of lawyers became an institution." (quoting DANIEL BOORSTIN, THE AMERICANS: THE COLONIAL EXPERIENCE 197 (1958))). Throughout the 17th and 18th centuries, this understandable anti-lawyer prejudice intensified "as 'the lower classes came to identify lawyers with the upper class.'" *Id.* at 827 (quoting LAWRENCE FRIEDMAN, A HISTORY OF AMERICAN LAW 82 (1973)). And when the time came to draft and ratify the Constitution, such anti-lawyerism and anti-elitism reached a crescendo. *Ibid.* One Anti-Federalist captured the zeitgeist this way when expressing his frustration with some supporters of the Constitution:

> [M]any undesigning citizens may wish [the Constitution's] adoption from the best motives, but these are modest and silent, when compared to the greater number, who endeavour to suppress all attempts for investigation; these violent partizans are for having the people gulp down the gilded pill blind-folded, whole, and without any qualification whatever, these generally, of the noble order of Cincinnatus, holders of public securities, men of great wealth and expectations of public office, Bankers and *Lawyers*: these with their train of dependants from the Aristocratick combination—*the Lawyer in particular*, keep up an incessant declamation for its adoption, like greedy gudgeons they long to satiate their voracious stomacks with the golden bait—The numerous tribunals to be erected by the new plan of consolidated empire, will find employment for ten times their present numbers; these are the loaves and fishes for which they hunger . . . .

No. 21-11180

*Essay by a Federalist*, Boston Gazette (Nov. 26, 1787), *reprinted in* 4 The Complete Anti-Federalist 117 (Herbert J. Storing ed. 1981) (emphasis added) (quotation omitted).

Considering the Founding generation's self-reliance and distaste for attorneys, it is unsurprising that "the right of self-representation has been protected . . . since the beginnings of our Nation." *Faretta*, 422 U.S. at 812. Indeed, many (perhaps most) colonial charters, declarations of rights, and State constitutions guaranteed self-representation. *See, e.g.*, *id.* at 828 n.37, 829 n.38, 830 n.40 (collecting examples). For example, the Pennsylvania Frame of Government of 1682 provided that "in all courts all persons of all persuasions may freely appear in their own way." Pa. Frame of Gov't art. VI (1682). The Georgia Constitution in 1777 likewise secured "that inherent privilege of every freeman, the liberty to plead his own cause." Ga. Const. art. LVIII (1777). And the first Congress did the same when it passed the Judiciary Act of 1789, which provided "in all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of . . . counsel." Pub. L. No. 1-20, 1 Stat. 73, 92. This language is functionally identical to the right at issue in this case and codified at 28 U.S.C. § 1654: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel."

With the statutory text and the corresponding right properly situated, let's begin with the parties' common ground. The parties first agree that federal law allows children to litigate *pro se*. Congress was quite clear on that. Nothing in § 1654 limits the right to proceed "personally"—that is, *pro se*— to those who are at least 18 years old. To the contrary, unless context dictates otherwise, congressional enactments generally treat adults and minors as equal "persons." 1 U.S.C. § 8(a). That's presumably why Dallas ISD concedes that "minor children have the same statutory right under 28 U.S.C. § 1654 as their parents to proceed in litigation *pro se*." Dallas Supp. Br. 12.

No. 21-11180

The parties' second agreement concerns the Federal Rules. Those Rules direct us to consider state law in determining who has the capacity to sue in federal court. *See* Fed. R. Civ. P. 17(b)(3) ("Capacity to sue is determined . . . by the law of the state where the court is located."). So here too Dallas ISD agrees that a child's "access to the [federal] courts, or capacity to sue or be sued, is determined by state not federal law." Dallas Supp. Br. 26.[2]

The parties disagree on how best to understand state law, but I do not think this is a close question. The Texas Legislature has unequivocally sided with Ms. Raskin: The "parent of a child" has the "right to represent the child in legal action and to make other decisions of substantial legal significance concerning the child." Tex. Fam. Code § 151.001(a)(7). True, Texas minors are "unable to sue or be sued in their individual capacities." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005). But both the Texas Supreme Court and the Texas Rules specify that minors can bring suit through a legal guardian, next friend, or guardian ad litem. *Ibid.*; Tex. R. Civ. P. 44 (a legal guardian may sue on behalf of a minor); *accord* Fed. R. Civ. P. 17(c) (providing that a minor can sue through a legal guardian, next friend, or guardian ad litem where consistent with state law). And the Texas Supreme Court has stated that a parent is "a legal guardian qualified to sue

---

[2] Federal Rule of Civil Procedure 17(c) likewise directs us to consider state law. For example, Rule 17(c) authorizes a minor to sue through a general guardian, a next friend, a guardian ad litem, or a like fiduciary. We nonetheless must understand those terms in light of state law restrictions on the capacity to sue and be sued. *See Rideau v. Keller Indep. Sch. Dist.*, 819 F.3d 155, 163 (5th Cir. 2016) ("[C]ourts, including ours, have read Rule 17(c) in conjunction with Rule 17(b), which mandates the use of state law in determining a representative's capacity to sue."); 6A Charles Alan Wright et al., Federal Practice and Procedure § 1571 (3d ed., April 2023 update) ("[T]he district court's power of appointment under Rule 17(c)(2) should not be used as a vehicle for circumventing the mandate in Rule 17(b) to employ state law to determine capacity.").

No. 21-11180

on his child's behalf" under Texas Rule 44. *In re Bridgestone Ams. Tire Ops., LLC*, 459 S.W.3d 565, 572 n.9 (Tex. 2015).

I would therefore hold that federal law gives Raskin's minor children the unequivocal right to "conduct their own cases personally," 28 U.S.C. § 1654; Federal Rule of Civil Procedure 17 directs us to consider state law in determining who has the capacity to sue; and Texas law plainly lodges that capacity in Ms. Raskin as the parent of JD1 and JD2. Tex. Fam. Code § 151.001(a)(7).

B.

Dallas ISD offers two primary responses: (1) Courts should not respect a parent's choice to appear for her children without an attorney because we cannot be sure it's what the child would want; (2) Courts have a freestanding responsibility to ensure the best interest of children before them, and mandatory attorney representation of minor children protects them from their "unskilled, if caring, parents." Dallas Supp. Br. 1. Both arguments are unavailing.

1.

First, Dallas ISD says that the choice to appear without an attorney isn't a "true choice" for minors because, under state law, they "cannot determine their own legal actions." Dallas Supp. Br. 12 (quotation omitted). Dallas ISD quotes liberally from a Second Circuit decision, which says: "[A] non-attorney parent must be represented by counsel" because the "choice to appear *pro se* is not a true choice for minors," so "[t]here is thus no individual choice to proceed *pro se* for courts to respect." *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990).

That critique, however, fundamentally misunderstands both the law and the parent-child relationship. As to the law, Dallas ISD confuses who has the authority to exercise the § 1654 *pro se* right (and other legal rights) when a parent acts as their child's legal guardian and sues on behalf of her child. As

No. 21-11180

discussed above, state and federal law assign to parents the right to "represent the child in legal action" and "make other decisions of substantial legal significance" on the child's behalf. Tex. Fam. Code § 151.001(a)(7). It is thus incorrect to say that there's no "individual choice" for "courts to respect." *Cheung*, 906 F.2d at 61. It's the *parent's choice* on the child's behalf—a choice written law recognizes and requires us to honor. So while the § 1654 *pro se* right is the child's, the parent as legal guardian is authorized to exercise that right on her child's behalf.

As to the parent-child relationship, Dallas ISD misunderstands that too. Parents make decisions all the time for their children, including decisions that children could not make on their own. *See, e.g.*, Tex. Fam. Code § 151.001(a)(1)–(11) (recognizing various rights and duties of parents); *see also Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 841 n.44 (1977) (noting that children "lack the capacity to make [certain] decision[s], and thus their interest is ordinarily represented in litigation by parents or guardians"); *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (explaining that the law "presume[es] that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions"). Parents sometimes use their rights to give legal effect to the child's wishes. *See, e.g.*, 10 U.S.C. § 505(a) (prohibiting 17-year-olds from enlisting in the armed forces, even if they want to, without parental consent); Tex. Fam. Code § 151.001(a)(6) (recognizing parent's "right to consent to the child's . . . enlistment in the armed forces"). Other times, parents use their rights to do things their children might not like. *See, e.g.*, Tex. Fam. Code § 151.001(a)(5) (recognizing parent's "right to the services and earnings of the child"); *id.* § 151.001(a)(2) (recognizing parent's "duty of . . . reasonable discipline of the child"); *id.* § 151.001(a)(10) (recognizing parent's "right to make decisions concerning the child's education").

But on Dallas ISD's reasoning, none of the judgments parents make on a daily basis deserve our respect because none are "true choices" for

minors. That cannot be so. Minors lack capacity to make "true choices" until they reach the age of majority, which is precisely why the law recognizes parents' rights to make myriad decisions for them—including whether to litigate without an attorney. It would make little sense to "reserve[] this particular litigation choice—whether to be represented by counsel—to child litigants without explanation for why this litigation choice should be set apart from all other choices routinely reserved to children's legal representatives," like "whether, when, and where to bring suit, what claims to advance, what information to disclose, and whom to sue." *No Right, No Access*, *supra*, at 848; *see also id.* at 860–72. To say nothing of the myriad other life-altering choices that parents make concerning their children's education, medical care, financial affairs, and even military service.

Nor could it be otherwise under 28 U.S.C. § 1654. After all, Dallas ISD concedes that § 1654 gives children the choice to litigate *pro se* or by counsel. Dallas Supp. Br. 12. But under their understanding, § 1654 offers minors a Hobson's choice: litigate with counsel, or don't litigate at all. Dallas ISD's heads-I-win-tails-you-lose approach to § 1654 plainly defies the text of the statute and centuries of Anglo-American law dating as far back as the Magna Carta. Dallas's position also would have baffled the Founders. As the Supreme Court explained in *Faretta*, "the basic right to self-representation was never questioned" at the Founding, and "the notion of compulsory counsel was utterly foreign to [the Founders]." 422 U.S. at 827–28, 833; *see also id.* at 834 ("To force a lawyer on a [litigant] can only lead him to believe that the law contrives against him.").

2.

Second, Dallas ISD says time and again that children are "the ward of every court where their rights are brought into jeopardy," so courts are entitled to vindicate the best interests of those children by protecting them from their "unskilled, if caring, parents." Dallas Supp. Br. 1, 12–13, 19. That is a startling assertion, and it's decidedly not the law. Almost 100 years ago,

No. 21-11180

the Supreme Court rejected the notion that every child is a ward and the notion that any organ of government, state or federal, has some sort of freestanding power to gainsay parents' choices. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925) ("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."). Rather, the Court has recognized that parents' interests "in the care, custody, and control of their children" is "perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.). Consequently, we cannot "infringe on the fundamental right of parents to make child rearing decisions simply because a . . . judge believes a 'better' decision could be made." *Id.* at 72–73 (plurality op.).[3] As Justice Blacklock has powerfully explained:

---

[3] *See also Parham*, 442 U.S. at 602–03 ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. . . . That some parents may at times be acting against the interests of their children . . . creates a basis for caution, but is hardly a reason to discard wholesale those pages of human experience that teach that parents generally do act in the child's best interests." (quotation omitted)); *id.* at 602 ("[O]ur constitutional system long ago rejected any notion that a child is the mere creature of the State." (quotation omitted)); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944) ("[T]he custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (noting that there is a "fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 834 (2011) (Thomas, J., dissenting) ("[T]he founding generation believed parents had absolute authority over their minor children."); *Troxel*, 530 U.S. at 91 (Scalia, J., dissenting) ("In my view, a right of parents to direct the upbringing of their children is among the 'unalienable Rights' with which the Declaration of Independence proclaims 'all men . . . are endowed by their Creator.' And in my view that right is also among the 'othe[r] [rights] retained by the people' which the Ninth Amendment says the Constitution's enumeration of rights 'shall not be construed to deny or disparage.'" (alterations in original)); *In re H.S.* 550 S.W.3d 151, 176–77 (Blacklock, J., dissenting) (decrying the prospect that "a judge or

No. 21-11180

> In the context of child-rearing, control of a child entails the power and authority to make important decisions about the child's life. . . . [T]o have control of a child is to govern, oversee, and direct the child. This means more than day-to-day or hour-to-hour supervision and discipline—and certainly more than deciding 'when a child gets up and goes to bed, how much television she watches, and whether she gets dessert.' *Ante* at 158. It means responsibility for the important choices that must be made for the child—choices about where she will live, her medical care, her education, and her future. Such control is by its nature, and by law, the exclusive right and duty of parents in the first instance. When important decisions must be made for a child, someone bears ultimate responsibility for them no matter how many other caregivers may be involved in the child's life or consulted on the decision. Unless the child's parents refuse or shirk this responsibility, it is theirs both in law and in fact.

*In re H.S.*, 550 S.W.3d 151, 169–70 (Tex. 2018) (Blacklock, J., dissenting) (quotation omitted).

It's true, of course, that the best-interest-of-the-child standard is an important one. But Dallas ISD's invocation of the standard proves both too little and too much here.

First, the too little. The best-interest-of-the-child doctrine derives from the *parens patriae* doctrine, and it is unclear that federal courts have inherent powers under either one. As the Supreme Court has explained:

> *Parens patriae* means literally "parent of the country." The *parens patriae* action has its roots in the common-law concept of the royal prerogative. The royal prerogative included the

---

group of judges—not the parents—will ultimately decide whether to uphold or reverse the parents' decisions about their child's future" and arguing that "government usurpation of parental authority raises serious constitutional questions").

No. 21-11180

> right or responsibility to take care of persons who are legally
> unable, on account of mental incapacity, whether it proceed
> from 1st. nonage: 2. idiocy: or 3. lunacy: to take proper care of
> themselves and their property.

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600
(1982) (quotation omitted); *see also Saavedra v. Schmidt*, 96 S.W.3d 533, 544
(Tex. App.—Austin 2002) (describing the best-interests standard as a subset
of the *parens patriae* doctrine). But when our Nation inherited these doctrines
from Mother England, we bequeathed them to the States—not the federal
government. *See Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 257 (1972)
("In the United States, the 'royal prerogative' and the '*parens patriae*'
function of the King passed to the States."); *Fontain v. Ravenel*, 58 U.S. (1
How.) 369, 384 (1855) ("Powers not judicial, exercised by the chancellor
merely as the representative of the sovereign, and by virtue of the king's
prerogative as *parens patriae*, are not possessed by the [federal] courts.").[4]

---

[4] *See also No Right, No Access, supra*, at 878, 880 ("[F]ederal courts' protective role
towards children is limited by several doctrines. First, it is limited by federalism. The *parens
patriae* doctrine in the United States derives from the powers of the English Court of
Chancery. All of the Court of Chancery's powers, including the *parens patriae* power,
devolved to the states and not to the federal government. . . . And even the states' *parens
patriae* authority is limited by the constitutional rights of parents to the care, custody, and
control of their children's constitutional rights. . . . Second, courts' role in overseeing
children's litigation interests is limited by the parent's and children's constitutional
rights. . . ."). Put differently, "The courts of the United States cannot exercise any equity
powers, *except those conferred by acts of congress*, and those *judicial powers* which the high court
of chancery in England, acting under its judicial capacity as a court of equity, possessed and
exercised, at the time of the formation of the constitution of the United States." *Fontain*,
58 U.S. at 384 (emphasis added); *see also id.* at 393 (Taney, C.J., concurring) (comparing
the "judicial power" conferred by Article III of the Constitution and the "prerogative
powers" that the King "as *parens patriae*, in England, exercised through the courts" and
concluding that "[t]he wide discretionary power which the chancellor of England exercises
over infants, lunatics, or idiots, or charities, has not been conferred" to the federal courts,
but rather "remain[s] with the States.").

No. 21-11180

And when States use their *parens patriae* powers to protect the best interests of the child, they do so because the parents cannot agree or because the child has no parents at all. *See* Tex. R. Civ. P. 173.2(a)(1). For example, in a contested divorce proceeding, the state court must use the best-interest standard to mediate ex-spouses' disagreement over their children's educations. *See, e.g.*, *Magro v. Magro*, 2020 WL 7251864, at *11–12 (Tex. App.—Houston [1st Dist.] Dec. 10, 2020). Likewise, when the parents are absent or so abusive as to be no parents at all, the state courts have numerous powers (including the power to terminate the parental relationship) to protect the best interests of the child. *See, e.g.*, *Interest of P.W.*, 2023 WL 68146 (Tex. App.—Waco Jan. 4, 2023). But I am aware of no authority, and Dallas ISD cites none, to suggest States can use their *parens patriae* powers to impose blanket prohibitions on parental choices simply because the government does not trust an otherwise-present-and-fit parent to choose wisely. And even if *States* had such limitless powers, Dallas ISD cites no authority to suggest *federal courts* somehow share them.

Second, Dallas ISD's invocation of the best-interest-of-the-child standard also proves too much. Even if state courts had freestanding best-interest powers, and even if federal courts had them too, it would prove that we need not create a general prohibition on parents' rights to sue on behalf of their children. It's precisely because some courts can sometimes intervene to prevent truly egregious harms that all courts cannot all-the-time intervene to prevent everyday parental decision-making. Thus, we need not decide here whether a federal court could intervene in a truly outrageous case to prevent a parent from prejudicing her unrepresented child's legal rights. *See, e.g.*, Fed. R. Civ. P. 17(c) (authorizing federal courts under limited circumstances to appoint guardians and other representatives). It's enough to hold that neither federal nor state law generally requires a parent to hire an attorney before suing on behalf of her children.

No. 21-11180

IV.

Lastly, a few words about the majority opinion. It claims that this dispute "starts and ends with the text of 28 U.S.C. § 1654." *Ante*, at 3. And recall that the statute provides "parties may plead and conduct their own cases personally or by counsel." The majority puts great weight on the phrase, "their own." *See id.* at 3–4. It says that Ms. Raskin can represent her children *pro se* if, and only if, state or federal law clearly assigns the children's case to Ms. Raskin—thus making their claims her "own." *Id.* at 3–7. And the majority intimates that state and federal law might not be sufficiently clear in this regard. *Id.* at 7 n.5.

I am troubled by the majority's approach for three reasons.

First, the majority's rigid construction of § 1654 renders other run-of-the-mill cases problematic. *See United States v. Palomares*, 52 F.4th 640, 647–49 (5th Cir. 2022) (Oldham, J., concurring) (explaining why "hyper-literalism is bad textualism"); *see also Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020) (Alito, J., dissenting). The parties, the district court, and the majority all agree that Ms. Raskin could have hired a lawyer to bring her children's claims. *E.g.*, *ante*, at 7 n.5 ("[A] *represented* guardian can sue on behalf of a child."). Why doesn't that run afoul of the majority's interpretation of § 1654? After all, the phrase "their own" modifies both "personally" and "by counsel." If the children's claims aren't Ms. Raskin's "own," then what authority does § 1654 give Ms. *Raskin* to exercise her children's "own" option to proceed "by counsel"? The more natural reading of § 1654 in this context would be:

> In all courts of the United States the ~~parties~~ [parent-representative] may plead and conduct their ~~own~~ [children's] cases personally or by counsel.

28 U.S.C. § 1654 (alterations added).

No. 21-11180

Second, even if the majority's interpretation of § 1654 is the right one, Texas law satisfies it. The majority says that "Congress left open to [S]tates the choice to authorize non-attorney parents to *represent* their children." *Ante*, at 7 (emphasis added). The key word here is "represent."[5] And the Texas Family Code assigns parents that very right: "A parent of a child has . . . the right to *represent* the child in legal action and to make other decisions of substantial legal significance concerning the child." Tex. Fam. Code § 151.001(a)(7) (emphasis added). The majority attempts to sidestep Texas Family Code § 151.001(a)(7)'s clear statement by suggesting it might not be clear enough. In the majority's words, § 151.001(a)(7) "does not *expressly* state that a parent can proceed *pro se*." *Ante*, at 7 n.5 (emphasis added). But such an exacting clear-statement rule is usually reserved for an area—like preemption or abrogation of state sovereign immunity—where the Legislature is acting in derogation of some otherwise well-established background principle. *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991) (preemption); *Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank*, 527 U.S. 627, 634–35 (1999) (abrogation). We do not require clear statements when the legislature merely confirms a notion—like the parent's right to make decisions for her child—that's centuries older than the American Republic itself.

---

[5] Indeed, the majority uses "represent" and "representation" throughout its opinion as synonymous with *pro se* advocacy on another's behalf. *See, e.g.*, *ante*, at 5 n.4 ("[L]ay practitioners who were not admitted to the bar *represented* others in court at various points before and after the Revolution." (emphasis added)); *id.* at 7 n.5 ("[W]e must not conflate capacity, which concerns a party's personal right to come into court, and *representation*, which asks who gets to act as the legal *representative* of the party in court proceedings." (emphasis added) (quotation omitted)); *id.* at 10 ("[T]he district court erred in failing to consider whether federal or state law designates Raskin's children's claims as her 'own' such that she can *represent* them." (emphasis added)).

No. 21-11180

Third, the majority puts undue emphasis on the general common-law presumption that non-attorneys can't represent others. Here's how the analysis goes. The majority cites a bevy of cases establishing a general presumption that, "at common law, non-attorneys could not litigate the interests of others," *ante*, at 4–5; then, armed with one citation to a Supreme Court partial *dissent*, the majority extends this general common-law presumption to encompass parental *pro se* advocacy in particular, *id.* at 5; finally, it suggests that to litigate on their children's behalf, *pro se* parents must identify a state or federal law that "expressly" "abrogates th[e] common-law rule or its corollary that non-attorney parents cannot act as attorneys for their children," *id.* at 7 n.5; *see also id.* at 5–7. If Ms. Raskin wanted to represent her neighbor or her friend from church, then the majority's conclusion might follow. But the parent-child relationship is far different from the relationship between an unlicensed non-attorney and a would-be client from the neighborhood or church. The parent-child relationship is a sacred, pre-political bond that preexists both the United States and Texas, and which is uniquely enshrined into state and federal law. That's likely why *none* of the cases the majority cites points to *any* evidence that parents were prohibited from making legal decisions for their children at common law.

The closest the majority comes is its citation to one footnote in Justice Scalia's partial dissent in *Winkelman ex rel. Winkelman v. Parma City School District*. 550 U.S. 516, 536 n.1 (2007) (Scalia, J., concurring in the judgment in part and dissenting in part); *see ante*, at 5. The footnote says, in relevant part:

> [P]etitioners also argue that even if parents do not have their own rights under the statute, they nonetheless may act on behalf of their child without retaining a lawyer. Both sides agree, however, that the common law generally prohibited lay

No. 21-11180

parents from representing their children in court, a manifestation of the more general common-law rule that nonattorneys cannot litigate the interests of another. See Brief for Petitioners 37; Brief for Respondent 9–10; see also, *e.g.*, *Collinsgru v. Palmyra Bd. of Ed.*, 161 F.3d 225, 232 (C.A.3 1998). Nothing in the IDEA suggests a departure from that rule.

550 U.S. at 536 n.1.

The majority cites this (and only this) for the proposition that non-attorney parents were prohibited at common law from representing their children *pro se*. But the foundation for the *Winkelman* footnote is shaky at best. For one, Justice Scalia's partial dissent wasn't controlling. Seven Justices disagreed with it. Moreover, the *Winkelman* majority explicitly declined to decide "whether IDEA entitles parents to litigate their child's claims *pro se*." *Id.* at 535. And finally, the sources Justice Scalia cited do not prove there was a common-law rule "prohibit[ing] lay parents from representing their children in court." *Id.* at 536 n.1. Justice Scalia cited *Collinsgru v. Palmyra Board of Education*, 161 F.3d 225, 232 (3d Cir. 1998). But *Winkelman* abrogated *Collinsgru*, and *Collinsgru* only said there's a general common-law presumption that "a non-lawyer may not represent another person in court"—*not* that there was a common law rule prohibiting *parents from representing their children pro se*. *Ibid.* And as I explain throughout this opinion, there's good reason (recognized throughout English and American jurisprudence) to treat the parent-child relationship differently for these purposes. Justice Scalia also cited portions of the parties' briefs, but they added nothing. The *Winkelman* petitioner, for example, discussed the general common-law principle that non-attorneys cannot represent others, then cited two cases that also did not discuss parents or children. Petitioner Br. at 37. And the *Winkelman* respondent cited *Collinsgru*, which—as explained above—only discussed the general *pro se* rule. Respondent Br. at 9–10. The Respondent then relied upon various circuit court cases holding

No. 21-11180

that non-attorney parents must be represented by counsel when suing on behalf of their children. *Ibid*. That, of course, merely begs the question. Those cases also uniformly relied upon the general common-law presumption against *pro se* representation—not any text, history, or tradition regarding parents and their children.

\*   \*   \*

Sadly, too many parents today do not share Ms. Raskin's passionate desire to fight for her children. And even more sadly, too many organs of government today *do* share Dallas ISD's passionate desire to stand between parents and their children. Ms. Raskin decided to fight back against that governmental effort, and her right to do so is both ancient and deeply rooted in American law and history. I can find nothing that justifies dismissing this case simply because Ms. Raskin and her children chose, as so many litigants understandably do, not to hire an attorney. Accordingly, I concur in the majority's decision to vacate and remand. But I would further hold that Ms. Raskin and her children may proceed *pro se*, full stop. And I respectfully dissent from the majority opinion's suggestion that Ms. Raskin must move in the district court to reinstate her original complaint.